**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**AT NASHVILLE**

| | | |
|---|---|---|
| **SHELLY VARNER,** | ) | |
| | ) | |
| | ) | **Case No. 1:20-cv-0079** |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Judge Campbell** |
| | ) | **Magistrate Judge Newbern** |
| **GENERAL MOTORS LLC,** | ) | |
| | ) | |
| **Defendant.** | ) | |

---

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S**
**PARTIAL MOTION FOR SUMMARY JUDGMENT**

GM's Spring Hill Plant has not had a woman work in its CUC as a Stationary Engineer ("SE") in over ten years. Indeed, only _one_ woman has ever held the position in Spring Hill; only men have been trained and held the SE position in over two decades. In August 2018, two SE positions came open; however, when only two women, Shelly Varner and Pam Elliott, applied for the positions, GM Management rescinded the job post and limited it to a trade Varner and Elliott were not members of- Mechanics. After receiving no applications, GM re-issued the original post for Varner and Elliott's trade- Tool & Die. But, this time two male employees, Noel and Hargrove, with the same trade, but with less seniority, applied. Even though all Tool & Die card holders met the same requirements to get their skilled trade card, it was determined by two men, Farley and Inman, that the two men were more qualified based on a largely subjective, verbal assessment than the equally qualified women who had more seniority. Importantly, because the position was for a Journeyperson _in Training_, whoever the position was awarded to would be required to receive significant formal education, training and certifications to receive the position, irrespective of prior experience. Thus, GM continued its statistically significant pattern of discriminating against

1

women in skilled trade positions at Spring Hill, and it continues to do so in retaliation for Varner's reporting of discrimination. Varner alleged both disparate impact and disparate treatment discrimination claims, as well as retaliation claims. (ECF 1, ¶¶39-41, 50-52). GM only moves to dismiss Varner's disparate treatment and retaliation claims, the disparate impact claims are not contested, thus the motion is a partial motion. Moreover, the disputed facts demonstrate that a reasonable jury could find that GM discriminated and retaliated against Varner. As such, GM's pending partial motion for summary judgment must be denied.

## I.    FACTUAL BACKGROUND

**Varner's Job Duties and Commitment to General Motors**

Shelly Varner worked for General Motors ("GM") for 28 years[1], beginning her career as a toolmaker apprentice and participating in the four-year apprentice program to earn her Journeyperson Tool & Die card. (Varner Dep. 25, 27, Ex. 2 p. 187). After earning her card, in skilled trades, Varner worked on machinery, lathes, mills, grinders, received blueprints, created parts, worked in the powertrain portion of the plant, the stamping department and as a general assembly mechanic. (Varner Dep. 27). Varner also worked with 100,000lb machines, repaired dies, and made engineering changes, and as a mechanic supported general assembly; she worked at a fast pace, supported other areas, fixed pneumatic guns and hoists, building platforms, and other things to prep for new cars coming in.[2] (Varner Dep. 36-39, 44).

**GM Position Selection Policies**

---

[1] Varner's female co-worker, Pam Elliott worked for GM for approximately forty-years, starting as a part-time assembler and working her way up to a Tool & Die Journeyman in 2004. (Elliott Dep. 30, 39, Ex. 2 p. 4; Farley Dep. 62). Elliott was initially a co-Plaintiff, but she resolved her claims at mediation. (ECF 49). The facts of Elliott's discrimination remain relevant as another female who was passed over for a stationary engineer job at the CUC.
[2] Varner has an Associate of Applied Science in Industrial Technology with Machinist. (Inman Dep. 52).

*EEO and Retaliation Policies:* GM professes to have a goal and initiative to increase diversity across all positions, which includes a workforce of people of different sexes, races, and other protected classes; this includes striving for a diverse interview pool and diverse interviewers to eliminate biases; however, Daniel Risner, the HR Director for the GM Spring Hill Plant did not have the same understanding, instead believing diversity initiatives applied only to salaried employees. (Risner Dep. 20-21; McPike Dep. 26; LaMarche Dep. 11, 13; Herron Dep. 22).

GM recognizes that discrimination includes acting "against someone in some manner based on their status" and treating an employee differently on the basis of their gender, including making stereotypical comments and making decisions regarding an employee's employment based on their protected class. (Risner 30(b)(6) Dep. 37). Additionally, GM professes to prohibit retaliation against employees who file complaints of discrimination; including "act[ing] against or respond[ing] in a negative fashion to someone."[3] (Risner 30(b)(6) Dep. 37).

At the time of Varner and Elliott's complaints, GM Headquarters had a process that when a complaint was received, the case would be assigned to an investigator who would assess the allegation, develop an investigation plan, formulate what evidence is needed, who needs to be spoken to, conduct interviews, contact HR when needed, and formalize findings in a report[4]. (Tocco Dep. 9-10). Both the local and GM Headquarters investigations are a separate process from the Union investigation and grievance process. (Risner 30(b)(6) Dep. 97). However, this was not done in Varner and Elliott's case. (Risner Dep. 16, 45; Farley Dep. 140; Inman Dep. 88-89).

---

[3] Retaliation can include writing up, terminating, or not fulfilling a grievance settlement after the employee has made a complaint of discrimination. (Risner 30b6 Dep. 93-40). However, Risner testified that the protected activity must be the sole reason for the denial of a position or action taken by the employer for it to constitute retaliation. (Risner 30b6 Dep 40-41).

[4] GM Headquarters used a separate system to track these investigations, however GM's legal department would make determinations whether some investigations are done "under privilege." (Tocco Dep. 11).

*Union Grievance Procedure:* GM is a party to both a national and local agreement with the United Automobile, Aerospace, and Agricultural Implement Workers of America ("UAW"), between which the national agreement supersedes the local.[5] (Risner Dep. Ex. 1 p. 450, 486, 523-25; Farley Dep. Ex. 3 p. 328, 335, 338-40, 353-54; Elliott Dep. Ex. 4 p. 446). For a violation, the "first step" consists of an employee filing a grievance with their committee person who addresses the issue with the employee's supervisor. (Risner 30(b)(6) Dep. 78-79). If the grievance does not resolve, the "second step" consists of being part of the meeting agenda between the shop committee and labor relations and GM issues an answer to the grievance; if not resolved, information is exchanged and the international union is contacted for the "third step."[6] (Risner 30(b)(6) Dep. 79, 84).

*GM's Procedures for Posting KSA positions:* When there is a shortage of employees in a particular skilled trade, opportunities will be offered to other trades who want to transfer and be retrained. (Farley Dep. 25). The union shop committee and management, including Jonathan McPike, the Maintenance Manager, agree to the terms of the job posting and whether it will be a "knowledge, skills, and abilities" ("KSA") posting, which is sent to HR to post.[7] (Farley Dep. 25, 27, 34; McPike Dep. 15-16; Inman Dep. 36). According to the local agreement, "where ability, merit, and capacity, as determined by the parties, are equal, the team member with the longest length of service capable of performing the job will be transferred . . . [t]ransfer for KSA areas under Paragraph 63(a) or 63(b) shall be filled by the highest seniority team member who meets the

---

[5] The local agreement is set up as local wage agreements and manage specific work rules within the plant. (Farley Dep. 23-24).

[6] If is it still not resolved then the grievance will go to the national parties, and a shakeout will occur in which the parties will attempt to determine the facts of the case and barring this, they will issue an appeal to the umpire for the case to be heard. (Risner 30b6 Dep. 79). To date, Varner appealed her settlement, and her grievance is at the third step. (Varner Dep. Ex. 13 p. 290-92; Risner 30b6 Dep. Ex. p. 8850).

[7] KSA postings are largely for leadership positions where there are more personality related factors weighed. (Herron Dep. 58).

4

minimum qualifications." (Farley Dep. Ex. 3 p. 354). Even though Risner was not familiar with the policy, GM Spring Hill's policy was that of the employees interviewed those who received 70% or more of the points available, the employee with the highest seniority takes precedent. (McPike Dep. 24; Elliott Dep. 70; Farley Dep. 11, 32; Inman Dep. 36-37, 86; Risner 30(b)(6) Dep. 23, Ex. 31 p. 8829). Further, GM affirmative action goals might be considered if all applicants are equal. (Risner 30(b)(6) Dep. 28).

**Stationary Engineer in the Central Utility Complex ("CUC")**

A Stationary Engineer ("SE") is considered "multicraft," because it encompasses mechanical, electrical, and HVAC tasks, including the operation of equipment, monitoring equipment, chemical usage, and maintenance. (Inman Dep. 9). SE has three primary skills, 1) refrigeration and HVAC, 2) machine repair, and 3) electrical.[8] (Inman Dep. 39). There are no female SEs at GM Spring Hill, and there have not been for approximately ten years; the union has received a number of complaints that the CUC was a "good ole boys club." [9] (Elliott Dep. 123; Inman Dep. 6, 16, 77; Risner 30(b)(6) Dep. 10-11; McPike Dep. 26, Herron Dep. 24).

Although, Journeypersons of various skilled trades receive the same hourly rate, the SE is a "large step-up" as employees receive significantly more opportunities for overtime,[10] have a more diverse trade career, and more career options outside of GM. (Varner Dep. 57, 62, 99; Elliott Dep. 62, 64, 66, 108, 168; Farley Dep. 52-53; Noel Dep. 9).

---

[8] A SE monitors machine outputs, intakes, services the machines and performs preventative maintenance, and responds to alarms; they sit in the control room to monitor and take calls from around the plant, and occasionally do special projects when a machine needs to be upgraded or repaired. (Hargrove Dep. 38-39).

[9] The last female in the CUC was hired when the GM plant was still a Saturn plant, she came back for a period as a contractor. (Elliott Dep. 124).

[10] The CUC runs 24/7, remains open during strikes and continued to run during COVID shutdowns; the only overtime limitations for the CUC SEs are safety limitations; CUC SEs can work 12-hour shifts, 7 days per week, making between time and half to double time pay. (Noel 17-18; Farley Dep. 53-54; Inman Dep. 28, 30; Risner 30b6 Dep. 56-60; Hargrove Dep. 29). Once a JIT receives their Journeyman card, they receive a bump in pay. (Hargrove Dep. 34). The Tool & Die position can be limited in its ability to diversify, the CUC covers many disciplines. (Noel Dep. 10).

5

**GM's Fall 2018 Journeyperson in Training ("JIT") Stationary Engineer Application and Interview Process**

GM began to discriminate against female applicants, Varner and Elliott, as soon as the JIT SE selection process began. GM initially posted the JIT SE allowing Tool & Die Makers to apply and after only females Varner and Elliott applied, McPike removed the original posting and re-posted it for only Mechanics, rendering Varner and Elliott ineligible. (Varner Dep. 92-93, Ex. 6 p. 222-24, Ex. 11 p. 2; Elliott Dep. 137, Ex. 6 p. 235, Ex. 12 p. 324; Inman Dep. 33; Farley Dep. Ex. 9 p. 2883-84; Herron Dep. Ex. 45, p. 000018, Ex. 46, p. 000020). The SE position was eventually re-posted to include Tool & Die Makers again, but it is disputed as to why; Farley testified it was because GM did not receive any mechanic applicants, but Varner and Mike Herron, Union Chairman, understood that the local union informed management the position could not be limited to mechanics. (Farley Dep. 70; Varner Dep. 92-93; Herron Dep. 20). In emails Rutherford indicated that the position was only for mechanics, but later testified it was for excess Tool & Die; however, two pages of the email thread were not produced. (Rutherford Dep. 7; Farley Dep. Ex. 9, p 2883). When it was re-posted to include Tool & Die Makers again, two men, James Hargrove and Matthew Noel applied, in addition to Varner and Elliott. (Farley Dep Ex. 5 p 225-228, Ex. 7 p. 229-33). None of the applicants were SEs. (Farley Dep. 84; Hargrove Dep. 13; Noel Dep. 25).

The CUC SE posting included required skills and preferred skills; the only educational requirement was to hold a Journeyman's card. (Elliott Dep. 125, Elliott Dep. 5 p. 220; Varner Dep. Ex. 5 p. 220; Farley Dep. Ex. 4 p. 2980). A JIT position is a position in which an employee is *trained* to receive their Journeyman card in the skilled trade. Thus, any applicants selected would receive training, including schooling and on the job training.[11] (Varner Dep. 61, Ex. 5 p. 220; Elliott Dep. 67-68, 101; Farley Dep. 15, 85; Rutherford Dep. 14; Herron Dep. 17). A JIT SE must

---

[11] Noel testified that the systems require a lot of learning to operate. (Noel Dep. 19).

become proficient and get training and education in all three aspects of the SE job: electrical, maintenance/hydraulics, and HVAC. (Inman Dep. 41, 69).

**GM discriminates against Varner and Elliott**

In late October 2018, Varner, Elliott, Hargrove, and Noel, all Tool & Die Journeyman card holders, were interviewed[12] for two open JIT SE positions, by Al Farley, Stationary Engineer and Local Committee Chairman, and Jeff Inman, Site Utility Manager for the CUC, both of whom are white males.[13] (Varner Dep. 65, 72, 90, 93; Elliott Dep. 71; Farley Dep. 7, 43; Hargrove Dep. 10, 12; Noel Dep. 7, Inman Dep. 6). Varner and Elliott had significantly more experience and seniority, both had worked for GM for at least ten years more than Noel and Hargrove respectively.[14] (Varner Dep. 67, 90, 93; Elliott Dep. 71; Farley Dep. 43; Hargrove Dep. 10, 12; Noel Dep. 7).

*Inman and Farley conduct an entirely subjective interview and selection process*

Inman and Farley conducted entirely subjective interviews making determinations whether interviewee responses were "positive" v. "excellent." (Varner Dep. 77, 86; Elliott Dep. 73, 86; Farley Dep. 43, 97; Herron Dep. 14-15). Even though there was no objective component, Farley admitted the purpose of multiple interviewers is to ameliorate subjectiveness; the interviewers must justify their scoring because it is submitted to the Chairman and the Maintenance Manager before proceeding with the job offer. (Farley Dep. 19, 33).[15]

Inman and Farley scored Varner and Elliott more harshly than Noel and Hargrove. After the interviews, Farley and Inman discussed their scoring, and came to agreements on some scores

---

[12] It was at the direction of Don Rutherford, Site Maintenance Manager and Assistant to McPike, that all applicants were interviewed. (Rutherford Dep. 7; Farley Dep. 64).

[13] Since 2014, no women have been part of the interview panel. (Farley Dep. 19). Neither Farley nor Inman have hired or selected a female for the position of Stationary Engineer in the CUC. (Inman Dep. 16, 24, 38).

[14] Hargrove only began working for GM in 2016 and Noel in 2000. (Hargrove Dep. 10; Noel Dep. 7).

[15] According to Farley, there is no policy or memo regarding the justification of scores, only that in practice the interviewers could not produce multiple aggregated scores and the interviewers had to come to a consensus. (Farley Dep. 92, 130).

for each category, often reducing their scores for Varner and Elliott. (Farley Dep. 77, 79-80,88-89, 117; Ex. 10 p. 2906-07, 2911, 2917, Ex. 14 p. 3042; Inman Dep. 59, Ex. 17 p. 2992; Elliott 81, Ex. 8 p. 291-92, Ex. 9 p. 2906-07, 2911, 2917). According to Farley, this was because they could not "justify" the scores they gave the women. (Farley Dep. 77). Noel and Hargrove, on the other hand, were given scores that exceeded the max number of points possible, and Farley and Inman increased a score on Hargrove and Noel's score sheets. (Elliott Dep. 103-104, Ex. 10 p. 2882; Farley Dep. 113, 123, Ex. 11 p. 2920, Ex 13 p. 2934; Varner Dep. Ex. 9 p. 2882; Inman Dep. 18 p. 3002, 3008, Ex. 20 p. 3015, 3018, 3022, 3023). Further, Inman and Farley chose to weight the "preferred skills" the same as the "required skills." (Varner Dep. 88, 91; Elliott Dep. Ex. 10 p. 2882). If Farley and Inman had not reduced Elliott's scores and given her the original scores Farley noted on his scoring sheet, Elliott's score would have been well above the required 70%, with a score of 132.5, and in fact above Hargrove's score. (Farley Dep. Exs. 10, 14-15). Additionally, according to Herron, Varner and Hargrove's scores were so substantially similar that seniority and demographics should have factored into the ultimate selection- of Varner, not Hargrove. (Herron Dep. 192). However, Inman did not consider Elliott or Varner's seniority. (Inman Dep. 55-56). Due to subjective scoring, Varner and Elliott's scores did not meet the 70% threshold, which if they had, seniority would have dictated Varner and Elliott be awarded the positions. (Farley Dep. 93, Risner 30(b)(6) Dep. 23, Ex. 31 p. 8829).

Farley and Inman made irrelevant, subjective, sex-based assessments including that Noel was a talker, articulate and seemed intelligent, but held it against Elliott for not being a "talker" and against Varner for not having a lot to say. (Farley Dep. 120, 126; Inman Dep. 63, 92).Inman held it against Elliott for not working in the CUC and working in Tool & Die most of her career, yet, he acknowledged this was due to the union structure that employees do not move around

8

departments at GM. (Inman Dep. 67, 71).[16] Inman also inexplicably noted on Varner's score sheet, that she is a "cheerleading mom." (Inman Dep. 74).

Contrary to the job description, Farley testified both Varner and Elliott were not "qualified applicants" who did not meet the "minimum qualifications" and were solely interviewed due to their seniority, because they did not have background related to the SE role, even though Farley admitted Varner could have been trained to be a SE because this was an "in training" position. (Farley Dep. 48, 122). According to Herron, Varner and Elliott were qualified applicants. (Herron Dep. 19, 44, 112). Inman claimed he had concerns with Varner being "turned loose" on industrial equipment based on her experience, however admitted that Varner would have received extensive training and not been "turned loose" as a Stationary Engineer. (Inman Dep. 62-63).

*Noel and Hargrove's subjective emphasis on prior experience did not affect the training required for the JIT Stationary Engineer position*

Farley told Elliott that Management did not want to train her and Varner, because it would take a year and half and they would need an electrical class; however, Noel and Hargrove received the same training regardless of their background and Journeyperson retraining was anticipated to take a year and a half;[17] which contradicts Farley's assertion that the JIT Stationary Engineer education and training is individualized based on the employee's prior experience and contradicts Inman's testimony that due to Noel's previous experience he would only have to take electrical coursework; contradicting his own testimony.[18] (Farley Dep. 15, 57, 84-85; Noel Dep. 25;

_____

[17] After their selection, both Noel and Hargrove attended the same courses, and Hargrove could not recall any courses he was not required to take due to his experience. (Hargrove Dep. 18, 22; McPike Dep. 19, Ex. 21 p. 5614).
[18] Noel testified the exception would be if the Stationary Engineer JIT already had an electrical or mechanic Journeyman cards. (Noel Dep. 24-25). Neither Noel nor Hargrove had either of these Journeyman cards. (Noel Dep. 26). Unlike an apprentice program, which takes approximately four years, a JIT already has basic skills & knowledge, and the employee is not starting from scratch; a JIT program takes approximately 18-months. (Varner Dep. 64; Elliott Dep. 68).

Hargrove Dep. 22, 17; Herron Dep. 17, 29, 36; Inman Dep. 41, 69; Varner. Dep. 62; Elliott Dep. Ex. 12 p. 324; McPike Dep. Ex. 21 p. 5613-16).

According to Inman and Farley, Noel and Hargrove were ultimately selected due to their "experience" however, Hargrove did not have previous experience as a SE[19] and Noel testified that the initial trainings focused on electrical, mechanical, and pneumatic systems, and they had to learn hydraulic systems and he did not receive any assessment at the beginning of his training to determine which specific courses he would need to take. (Noel Dep. 21-22; Hargrove Dep. 43). Moreover, GM re-trains based on prior skills and experience because employees must adhere to GM's guidelines. (Hargrove Dep. 22).[20]

*GM employees dispute who had the final decision in selecting Noel and Hargrove for the JIT Stationary Engineer positions.*

During Varner and Elliott's application process, Herron was Chairman and Maintenance Manager was Jonathan McPike. (Farley Dep. 34). According to Farley and Inman, they submitted the scores to McPike and Herron to discuss and make the final decision and only after they made the decision would Farley and Inman be instructed reach out to the candidates and let them know of their selection or non-selection, although Inman testified this was a formality. (Farley Dep. 35, 66, 133-134; Inman Dep. 21, 82). According to Farley, once the scores were submitted to McPike and Herron, it was up to them to determine whether the process promotes diversity and whether demographics needed to be measured and to factor in GM's diversity goals. (Farley Dep. 100-101, 106). Herron, McPike, and Risner dispute Farley and Inman's testimony that they were the final

---

[19] Hargrove testified he applied to be a Stationary Engineer because he was new to GM, had never done this type of work because and wanted to try it out; he understood he was starting a "brand new trade." (Hargrove Dep. 24, 33).
[20] Further, despite already having participated in PLC training prior to GM, Hargrove had to retake this programming as GM has their own way of doing things to follow GM's guidelines. (Hargrove Dep. 22). Noel, when first hired by GM had his previous work experience with similar machines as the chiller, yet still had to receive GM training. (Noel Dep. 21-22).

decisionmakers,[21] regardless of whether the more senior or less senior employee is selected. (Risner 30(b)(6) Dep. 48, 91; Herron Dep. 46; McPike Dep. 30). McPike testified that he did not recall which employees received the recommendations for selection after the interviews, only that two met the requirements, and that he did not have to sign off on Inman and Farley's decision, but he was "ok" with it. (McPike Dep. 23-24, 28-31). When Elliott spoke to McPike about her non-selection, he responded, "we have a great bunch of guys over there and they get along so well;" a conversation McPike disputes. (Elliott Dep. Ex. 3 p. 5, Ex. 19 p. 9; McPike Dep. 28).

Although Farley testified that he did not see the relationship between bias and the interview process,[22] according to Dr. Patrick Grzanka, subjective measures allow for "broader social forces to influence organizational decision-making and can therefore result in systemic, structural disadvantages for women" when there is a "null environment," which suggests that when insisting that "gender is irrelevant at work" gender inequality is reproduced. (Farley Dep. 102; MSJ Ex. 1, Grzanka Report p. 3, 5). Further, when interviewers and management are predominantly male, the hiring process is susceptible to "status homophily, meaning "the inclination of similarly situated groups prefer to engage in social interactions with other similarly situated groups." (MSJ Ex. 1, Grzanka Report p. 4). The result of this is that in male-dominated industries where there are not willful and structural interventions to influence the gendered nature of organizational structures, consistent hiring or selection outcomes occur, *i.e.* men continue to be promoted over their female counterparts. (MSJ Ex 1, Grzanka Report, p. 5).

Dr. Grzanka's report is consistent with Dr. Marianne Wanamaker's report regarding the statistical significance of the male to female ratios at the GM Spring Hill Plant. According to Dr.

---

[21] Risner uses this understanding as support that the interview process is not biased because a union representative is present in the interview and one of the final decisionmakers. (Risner 30b6 Dep. 92).
[22] Although Farley, testified that part of the reason he became involved with the KSA process was to "eliminate abuse" and "reverse racism," specifically stating, that "people are people." (Farley Dep. 107)

Wanamaker, the Spring Hill GM Plant, there is a statistical significance to the rate in which the Spring Hill GM Plant employs a lower share of women in its skilled and semi-skilled trades than other companies within the same industry in not only its local area, but the state of Tennessee, and the East South Central labor markets. (MSJ Ex. 2, Wanamaker Statistical Report p. 1, 6, 7). Notably, this statistical significance is not present in its unskilled workforce. (Id. p. 1, 7). As a result of the statistical significance, Dr. Wanamaker concluded the low female share of Craft Workers was not the result of ransom elements or chance. (Id. p. 7).

**As a Result of GM's Discrimination, Varner and Elliott Engage in Protected Activity**

Approximately one week after her interview, around the beginning of November 2018, Varner was notified by Inman that she was not selected; on January 18, 2019, Varner filed her complaint of sex discrimination with the help of Herron and began the formal 6(a) union grievance process. (Inman Dep. 84; Elliott Dep. Ex. 11 p. 97; Varner Dep. 105-106, 109, Ex. 10 p. 27; Brasich Dep. 19, 21; Herron Dep. 50-51). Soon after being notified of her non-selection, Elliott too contacted her committeeman, Bill Cundiff, and filed her complaint of sex discrimination.[23] (Elliott Dep. 111, Ex. 11 p. 97; Ex. 12 p. 320, 322, 324, Ex. 14 p. 332-34). Despite Risner's testimony to the contrary, Union Chairmen do not regularly fill out grievances, and in fact do so only when the grievances are of the "highest importance;" further Herron informed Varner her complaint had merit and he felt strongly about her complaint. (Risner 30(b)(6) Dep. 85; Herron Dep. 50-51, Varner Dep. 118). Due to Herron's involvement, the grievance process began at the second step of the grievance process. (Risner 30(b)(6) Dep. 85). Because Herron believed there had been a clear violation of the union agreement, he did not refer Elliott and Varner's grievances to the civil

---

[23] Prior to filing the formal grievance, both Varner and Elliott in November 2018 filed the UAW-GM National Agreement Paragraph 6a Determination paperwork, which is required to determine the form of discrimination that occurred, before a grievance can be filed. (Elliott Dep. Ex. 12 p. 320, 322, 324; Varner Dep. Ex. 11 p. 2-4).

rights committee for investigation concluding it would have been a waste of time due to the evidence of discrimination. (Elliott Dep. 136; Herron Dep. 224-25).

On May 21, 2019, after Randall Brasich, HR/LR Relations, received all of Varner and Elliott's grievances, Herron and Brasich negotiated a settlement for Varner and Elliott regarding their grievances of discrimination, and Brasich notified McPike.[24] (Varner Dep. 108, Ex. 12 p. 2975; Brasich Dep. 12-14, Ex. 22-27; Elliott Dep. Ex. 13 p. 2881). This settlement included that Elliott, due to her seniority, would be placed in the next open SE position, regardless of whether it was formally a JIT, and Varner would receive the next open position after Elliott, and would be trained. (Varner Dep. 112, 119, 121-22; Herron Dep. 60; Elliott Dep. 100, 127, Ex. 21 p. 3). However, Risner and McPike disputed this, testifying that this settlement was only an agreement that Varner and Elliott would be "considered" for the next JIT SE in the powerhouse, and McPike could not recall being notified. (Risner 30(b)(6) Dep. 86; McPike Dep. 32; Brasich Dep. 15). Herron testified that the ambiguous "consideration" language was to allow for the extreme situation in which there was a plant shut down, which would give that SE Journeyperson priority for placement into the open position. (Herron Dep. 61, 67, Ex. 52 p. 00004; Ex. 53 p. 00003). Regardless, Elliott and Varner should have been notified of any open positions. (Rutherford Dep. 28). Brasich claimed Elliott and Varner would not be notified of openings and would have had to see the posting. (Brasich Dep. 15). Contrary to Risner and McPike's testimony, according to Herron and union documents, there was a date selected for Elliott to be placed in a CUC position, and discussion of backdating their seniority dates. (Risner 30(b)(6) Dep. 87, Ex. 40 p. 2-3; Herron Dep. 237; Elliott Dep. Ex. 15 p. 326).

---

[24] McPike, in his position, is not involved with settlement negotiations. (McPike Dep. 33).

On June 5, 2019, Elliott and Varner filed EEOC charges against GM. (Elliott Dep. 132, Ex. 16 p. 339-40; MSJ Ex. 3 Varner EEOC Charge p. 436). GM did not investigate Elliott or Varner's grievance complaints or EEOC charges; Risner did not have any communications with Elliott or Varner regarding their complaints, Brasich could not recall talking to Headquarters about an investigation into the complaints, and neither Farley or Inman were interviewed or spoken to regarding any GM investigation into Elliott and Varner's grievances, and no formal investigation was conducted, as there was an "external investigation underway." (Risner Dep. 16, 26, 45; Farley Dep. 140; Inman Dep. 88-89; Tocco Dep. 13).

Around June 2020, Elliott emailed Mary Barra, CEO of GM, about the discrimination she experienced because Barra had recently spoken about discrimination reports from multiple GM plants. (Elliott Dep. 78-79, 148). As a result, Tiana Tocco, GM Investigator[25], reached out to Elliott and eventually had a phone call with her; during these communications Elliott explained that there had been no female SEs in the CUC for ten years and McPike's post-selection comment the CUC had a good group of guys. (Elliott Dep. 79; Tocco Dep. 7, Ex. 28 p. 39, Ex. 29 p. 267).

Although McPike testified that Tocco contacted him regarding Elliott and Varner's grievances and that he referred her to Inman and Risner; Tocco testified that she only contacted McPike about what experience was needed in the JIT SE job and that GM national did not contact Risner. (McPike Dep. 34; Risner 30(b)(6) Dep. 105-106; Risner Dep. 47; Tocco Dep. 7, 13). At this time, it would have been local HR's responsibility to investigate, which did not happen. (Tocco Dep. 13, 15; Risner Dep. 16, 45; Farley Dep. 140; Inman Dep. 88-89).

**GM retaliates Elliott and Varner After They Engaged in Protected Activity**

---

[25] As an investigator, Tocco conducted investigations which focused on employee relation issues such as allegations of harassment, discrimination, conflicts of interest, and conflicts between employees. (Tocco Dep. 8).

After Elliott and Varner filed their EEOC charges, GM rescinded its offer to place Elliott in a CUC SE JIT position.[26] (Elliott Dep. 141, Herron Dep. 115-17, Ex. 45 p. 000019-20, Ex. 51 p. 4). GM continues its pattern of retaliation and by failing to fulfill the grievance settlement and it continues to refuse to place Varner into the position of SE even though positions have been opened since Noel and Hargrove. (Varner Dep. 130; Herron Dep. 77, 115-17, 134; Risner 30(b)(6) Dep. 87, Ex. 40 p. 2-3; Elliott Dep. Ex. 15 p. 326).

It is disputed whether the SE positions that have been filled since were external postings or internal postings and whether GM policies for hiring were followed since Varner and Elliott filed their grievances and EEOC charges alleging sex discrimination and retaliation. Four men have been hired into the CUC as SE; Elliott and Varner have been ineligible to apply because these postings have been exclusively for Mechanic Journeyman, not Tool & Die. (Varner Dep. 125; Elliott Dep. 137, 139; Hargrove Dep. 32; Risner 30(b)(6) Dep. Ex. 34, 35; MSJ Ex. 4 – Defendant's Responses to Plaintiff's Third Requests for Interrogatories p. 6). According to McPike and GM Corporate Representative, Kristyn Donaldson, only when there are no bona fide tradespersons from other facilities and there is an excess of persons in a trade, is retraining for another trade considered, otherwise external candidates are considered. (McPike Dep. 11; Donaldson 30(b)(6) Dep. 13-14, 16; Farley Dep. 37; Risner 30(b)(6) Dep. 22). According to Farley, since there has not been an excess of any tradesman in other skilled trades, GM management, including McPike and HR, decided to hire externally so an internal employee would not need to be replaced. (Farley Dep. 36-37; McPike Dep. 10-12). However, Risner testified that no external hires have been hired into SE JIT positions and only bona fide SE Journeymen have been hired externally.[27] (Risner 30(b)(6)

---

[26] Elliott was informed by Herron, her supervisor, and other coworkers that she was to begin work as a Stationary Engineer in the CUC. (Elliott Dep. 141-142). After filing her EEOC charge, when Elliott asked her supervisor why she had not been moved to the CUC he responded that he could no longer talk about it. (Elliott Dep. 144).

[27] The date next to their name is the Trades Date, not the date they began with GM. (Risner 30b6 Dep. 64).

19-20, 53). According to Herron, it is new and unusual that SEs are being posted only to external candidates, and that internal candidates should be exhausted before posting externally. (Herron Dep. 137; Farley Dep. 141, 143; Rutherford Dep. 30; Donaldson 30(b)(6) Dep. 10-11).

After Varner and Elliott were non-selected, GM still had an excess of Tool & Die Makers in December 2018, and GM still has an excess and a need for more SEs. (Varner Dep. 45; Farley Dep. 40; McPike Dep. 13-15, Ex. 21 p. 5611). According to Farley, there have been transfers of SEs from other GM plants, that were reduced, causing the national agreement to supersede any other agreement, and until 2022 no SE was hired externally who did not already have their SE card. (Farley Dep. 39; Risner Dep. Ex. 1 p. 450, 486, 523-25). However, Herron testified there have been no plant company-wide shutdowns since 2018 and Inman testified that of the four male employees selected for the CUC SE positions since Varner and Elliott's non-selection, in 2021, at least two of them were external hires, one from the Navy and another from a winery, neither had SE or journeyperson cards. (Inman Dep. 25-28; MSJ Ex. 4 – Defendant Responses to Third Requests for Interrogatories p. 6; Herron Dep. 121; Risener Ex. 35). GM continues to retaliate against Varner because SE CUC positions continue to be filled with men. (Varner Dep. 119, 140; Hargrove Dep. 32; Inman 23-25). At the time of deposition, neither Noel nor Hargrove had received their SE Journeymen cards. (Hargrove Dep. 16; Noel Dep. 26). Both acknowledged their training was extensive. (Noel Dep. 19-21; Hargrove Dep. 17-20). Noel in particular recognized that that "he could go on for hours and hours" on what he has had to learn, because "there's so much to learn." (Noel Dep. 19).

## II.     SUMMARY JUDGMENT STANDARD

"Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves v. Sanderson Plumbing*

*Products, Inc.,* 530 U.S. 133, 150-151 (2000). In determining whether the moving party has met its burden, the [t]he evidence of the nonmovant is to be believed and court must view the factual evidence and draw all reasonable inferences in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U. S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986))('[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'"); *Smith v. Hudson*, 600 F.2d 60, 63 (6th Cir. 1979). *Walker v. Davis*, 649 F.3d 502, 505 (6th Cir. 2011) ("At the summary judgment stage, the relevant facts are the plaintiff's version of the facts . . ..").

## III.     ARGUMENT

### A.  GM Discriminated Varner in Violation of Title VII and the THRA

"Title VII makes it unlawful for an employer to discriminate against any individual with respect to [her] compensation …of employment because of such individual's race, color, religion, sex, or national origin*." Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 561 (6th Cir. 2004); 42 U.S.C. 2000e-2(a)(1).  "Title VII's prohibition of discriminatory employment practices was intended to be broadly inclusive, proscribing "not only overt discrimination but also practices that are fair in form, but discriminatory in operation." *Griggs* v. *Duke Power Co*., 401 U.S. 424, 431 (1971).[28] "An employer violates Title VII when it intentionally [takes action against] an individual employee based in part on sex. It doesn't matter if other factors besides the plaintiff 's sex contributed to the decision. And it doesn't matter if the employer treated women as a group the same when compared to men as a group. If the employer intentionally relies in part on an individual employee's sex when deciding to [take action against] the employee—put differently, if changing the employee's sex would have yielded a different choice by the employer—a statutory violation

---

[28] Title VII and THRA claims are analyzed the same. *Chattman v. Toho Tenax Amer.,* Inc., 686 F.3d 339, 346 (6th Cir. 2012) (analyzing THRA claims under the Title VII standard).

has occurred." *Bostock v. Clayton Cty*., 140 S. Ct. 1731, 1741 (2020).

Under Title VII and the THRA, an employee can prove discrimination under two separate theories: disparate treatment and disparate impact. *Phillips v. Cohen,* 400 F.3d 388, 397 (6th Cir. 2005). A disparate treatment claim involves intentional discrimination against an employee on the basis of race, sex, or other prohibited factors. *Dunlap v. TVA,* 519 F.3d 626, 630 (6th Cir. 2008). A disparate impact claim does not require a showing of intent to discriminate. *Id.* (citing *Griggs v. Duke Power Co.,* 401 U.S. 424, 432 (1971)). Because in "some cases, employers' facially neutral practices that, in fact, are discriminatory in operation." *Ricci v. De Stefano*, 557 U.S. 557, 578 (2009) (citing *Griggs*). In *Griggs*, the Court stated the: "touchstone" for disparate-impact liability is the lack of "business necessity," in particular "[i]f an employment practice which operates to exclude [minorities] cannot be shown to be related to job performance, the practice is prohibited" and that it is the employer's burden to demonstrate that practice has "a manifest relationship to the employment in question." *Id.* at 431-432. Moreover, the Supreme Court has recognized that "[e]mployment tests can be an important part of a neutral selection system that safeguards against the very [sex-based] animosities Title VII was intended to prevent." *Ricci v. De Stefano*, 557 U.S. at 584. Likewise, subjective, or discretionary decision-making may constitute an employment practice that may be subject to a disparate impact analysis under Title VII. *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 991 (1988).

GM only contends that Varner is unable to demonstrate a prima facie case and pretext based on a disparate treatment theory, but it failed to argue that as a matter of law its subjective decision-making did not result in a disparate impact on minorities, thus dismissal of that claim is waived. (ECF 17, MSJ Memo. p. 10. *See* ECF 1, Complt. ¶¶39-41, 50-52).

**1. A Reasonable Jury Could Conclude that GM Intentionally Discriminated Against Varner, *i.e*, Disparate Treatment**

"[T]o survive summary judgment a plaintiff need only produce enough evidence to support a prima facie case and to rebut, but not to disprove, the defendant's proffered rationale." *Griffin v. Finkbeiner*, 689 F.3d 584, 592 (6th Cir. 2012). The burden of proof at the prima facie stage is minimal. *Dixon v. Gonzales,* 481 F.3d 324, 333 (6th Cir. 2007).[29] Here, Defendant challenges only Plaintiff's ability to demonstrate elements two and four of the easily met prima facie test and pretext. (ECF 52, MSJ Memo. pp. 12-13). In failure-to-promote cases, the Sixth Circuit only requires a plaintiff to show that she possesses "similar qualifications" to the employee who received the promotion. *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 814 (6th Cir. 2011). In doing so, a comparison of characteristics such as "[d]ifferences in job title, responsibilities, experience, and work record," must be made in order to make an informed determination about whether an employment decision was based on pretext. *Leadbetter v. Gilley*, 385 F.3d 683, 691 (6th Cir. 2004).

*Plaintiff was Qualified*- The posting for KSA 18-21 listed the required skills, preferred skills and education requirements. (Farley Dep. Ex. 4). Varner had the required skills, or she would not have been eligible to interview. Simply because GM did not give weight to her skills similarly to the men, is the crux of the discriminatory effect that a jury must decide. However, more problematic is that this position was for a journeyperson "in training," so no matter what, the candidate would need to receive a total of 3030 hours to complete re-training from a die maker to a SE. (McPike Dep. Ex. 21). Indeed, the fact that subsequent external hires were not card holding SEs demonstrates that the education and training for this position was to take place in the estimated

---

[29] Likewise, the Supreme Court has cautioned that pretext need not "virtually jump off the page and slap you in the face" and indeed such rigor is not necessary and is "unhelpful and imprecise." *Ash v. Tyson Foods, Inc.,* 546 U.S. 454, 456-458 (2006). "'Pretext is a commonsense inquiry: did the employer [take action] for the stated reason or not?'" *Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 285 (6th Cir. 2012) (quoting *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 n.4 (6th Cir. 2009)).

19

1.5 year time to complete training. (Risner Dep. Ex. 21). The fact that subsequent hires did not even have a baseline journeyperson card demonstrates that any potential candidate would have received their training as a journeyperson *in training*.

*Men received the CUC SE jobs that Varner was Qualified for*- Varner and Elliott and the men who received the job were all Tool & Die journeypersons.[30] This was the only educational requirement. (Farley Dep. Ex. 4). The only other "required" skills Varner stated she possessed: machine repair skills, read from blueprints, use precision measuring tools, experience with rigging techniques, working knowledge of hydraulics and pneumatics, experience with pumps, experience on lathe and mill, gears, bearings and gas reducers. (Varner Dep. 27, 36-39, 44; Farley Dep. Ex. 4; *C.f.*, Farley Dep. Ex. 8, Ex. 12 pp. 2948-2951; Inman Dep. Ex. 19 pp. 3029-3032). Apparently, GM is hanging its hat on "preferred or useful" skills, but useful skills is not a "qualification" per GM's own job post. (Farley Dep. Ex. 4). Moreover, as explained above, this was an "in-training" position, thus all candidates had the same base qualification: a Tool & dDe journeyperson card which would have required the same training to qualify for a SE journeyperson card. (McPike Ex. 21). Thus, Varner's non-onerous burden to satisfy the prima facie case has been established.

*Pretext*- In addition to the foregoing, the following demonstrates evidence of pretext:

- Varner (and Elliott) had had the same basic qualification, Tool & Die Journeyperson, as Hargrove and Noel and neither of whom had any required certification above and beyond what Varner possessed. (Farley Dep. Ex. 4).
- After only females Varner and Elliott applied, McPike removed the original posting and re-posted it for only Mechanics, rendering Varner and Elliott ineligible. (Varner Dep. 92-93, Ex. 6 p. 222-24, Ex. 11 p. 2; Elliott Dep. 137, Ex. 6 p. 235, Ex. 12 p. 324; Inman Dep. 33; Farley Dep. Ex. 9 p. 2883-84; Herron Dep. Ex. 45, p. 000018, Ex. 46, p. 000020). When it was re-posted to include Tool & Die Makers again, two men, James Hargrove and Matthew Noel applied, in addition to Varner and Elliott. (Farley Dep Ex. 5 p 225-228, Ex. 7 p. 229-33). As a result of the initial pulled post, Varner and Elliott were not selected.
- When the SE position was eventually re-posted include Tool & Die Makers again, it is

---

[30] Even though Elliott has settled her claims, the fact that she, another woman experienced the exact same kind of discrimination remains relevant. *See Sprint/United Mgmt. v. Mendelsohn,* 552 U.S. 379, 128 S. Ct. 1140, 1147, 170 L. Ed. 2d 1 (2008) (other acts of discrimination may be admissible evidence).

disputed as to why; Farley testified it was because GM did not receive any mechanic applicants, but Varner and Herron understood that the local union informed management the position could not be limited to mechanics. (Farley Dep. 70; Varner Dep. 92-93; Herron Dep. 20).

- Varner had a long, successful career with GM, thus her knowledge of GM systems, out-ranked both Noel and Hargrove, in addition to her longer seniority. (Varner Dep. 25, 27, 67, 90, 93, Ex. 2 p. 187; Farley Dep. 43; Hargrove Dep. 10, 12; Noel Dep. 7).
- Varner's interview panel and decisionmakers lacked diversity, consisting of an all-male panel. (Farley Dep. 7, 43; Inman Dep. 6).
- Neither Noel, nor Hargrove had a certification that would have or that did negate the required SE training. (Farley Dep. Ex. 7, p. 232-233; Ex. 5 p. 228; C.f., McPike Dep. Ex. 21).
- There are no female SEs, and there have not been for approximately ten years; the union has received a number of complaints that the CUC was a "good ole boys club." (Elliott Dep. 123; Inman Dep. 6, 16, 77; Risner 30(b)(6) Dep. 10-11; McPike Dep. 26, Herron Dep. 24).
- The decisionmakers noted that Elliott and Varner's demeanor, or lack of talkativeness, during the interview played a part in their decision, in addition to noting her being a "cheerleading mom." (Inman Dep. Ex. 63, 74, 92; Farley Dep. 120, 126). Each statement masks discriminatory derision.[31]
- When Elliott spoke to McPike about her non-selection, he responded, "we have a great bunch of guys over there and they get along so well;" a conversation McPike disputes. (Elliott Dep. Ex. 3 p. 5, Ex. 19 p. 9; McPike Dep. 28).
- Inman and Farley conducted subjective interviews making determinations whether interviewee responses were "positive" v. "excellent." (Varner Dep. 77, 86; Elliott Dep. 73, 86; Farley Dep. 43, 97; Herron Dep. 14-15). Routinely ranking the men higher.
- Inman and Farley scored Varner and Elliott more harshly than Noel and Hargrove. After the interviews, Farley and Inman discussed their scoring, and came to agreements on some scores for each category, often reducing their scores for Varner and Elliott. (Farley Dep. 77, 79-80,88-89, 117; Ex. 10 p. 2906-07, 2911, 2917, Ex. 14 p. 3042; Inman Dep. 59, Ex. 17 p. 2992; Elliott 81, Ex. 8 p. 291-92, Ex. 9 p. 2906-07, 2911, 2917). According to Farley, this was because they could not "justify" the scores they gave the women. (Farley Dep. 77). Noel and Hargrove, on the other hand, were given scores that exceeded the max number of points possible, and Farley and Inman increased a score on Hargrove and Noel's score sheets. (Elliott Dep. 103-104, Ex. 10 p. 2882; Farley Dep. 113, 123, Ex. 11 p. 2920, Ex 13 p. 2934; Varner Dep. Ex. 9 p. 2882; Inman Dep. 18 p. 3002, 3008, Ex. 20 p. 3015, 3018, 3022, 3023).

---

[31] *See, e.g., Yazdian v. ConMed Endoscopic Techs., Inc.*, 793 F.3d 634, 652 (6th Cir. 2015):

There is a difference, however, between a refusal to follow an order and an assertion that an employee was "rude" or "defiant." Indeed, there may be some instances when the allegedly insubordinate act may be a response to a sort of unspoken, subliminal discrimination in the workplace. For example, a woman who takes a strong position may be considered "pushy," whereas a man who does the same is "assertive." One manager may call a black man "aggressive" and a white man "passionate" for the same speech. These are just a few examples of how subjective these adjectival labels can be. ***And whether these adjectives are evidence of discrimination or are legitimate grounds for termination requires examining the words in context and the demeanor of the speakers—quintessential jury functions.*** (emphasis added).

- According to Herron, Varner and Hargrove's scores were so substantially similar that seniority and demographics should have factored into the ultimate selection- of Varner, not Hargrove. (Herron Dep. 192). However, Inman did not consider Elliott or Varner's seniority. (Inman Dep. 55-56).
- Herron was adamant that the decision was unusual and in fact discriminatory. Herron Dep. 137, 224-25).
- Farley admitted Varner could have been trained to be a SE because this was an "in training" position. (Farley Dep. 48, 122).
- According to Inman and Farley, Noel and Hargrove were ultimately selected due to their "experience" however, Hargrove did not have previous experience as a SE[32] and Noel testified that the initial trainings focused on electrical, mechanical, and pneumatic systems, and they had to learn hydraulic systems and he did not receive any assessment at the beginning of his training to determine which specific courses he would need to take. (Noel Dep. 21-22; Hargrove Dep. 43). Moreover, GM re-trains based on prior skills and experience because employees must adhere to GM's guidelines. (Noel Dep. 21-22).
- At the time of deposition, Noel and Hargrove still had not received their SE Journeymen cards, which is indicative of the training they had to receive. (Hargrove Dep. 16-20; Noel Dep. 26, 19-21).
- Statistically: at the Spring Hill GM Plant, there is a statistical significance to the rate in which it employs a lower share of women in its skilled and semi-skilled trades than other companies within the same industry in its local area, the state of Tennessee, and the East South Central labor markets. (MSJ Ex. 2, Wanamaker Statistical Report p. 1, 6).
- Noel and Hargrove received the same training regardless of their background and Journeyperson retraining was anticipated to take a year and a half. (Farley Dep. 15, 57, 84-85; Noel Dep. 25; Hargrove Dep. 22, 17; Herron Dep. 17, 29, 36; Inman Dep. 41, 69; Varner. Dep. 62; Elliott Dep. Ex. 12 p. 324; McPike Dep. Ex. 21 p. 5613-16).

Considering all of this evidence of pretext in the light most favorable to Varner, there is a genuine issue of fact that GM's subjective decision(s) regarding selection/promotion are tainted by sex based bias. *Wright v. Murray Guard, Inc.,* 455 F.3d 702, 721 (6th Cir. 2006) ("[i]nquiries regarding what actually motivated an employer's decision are very fact intensive," such issues "will generally be difficult to determine at the summary judgment stage" and thus will typically require sending the case to the jury."). Summary judgment must be denied on this basis.

### 2. A Reasonable Jury Could Conclude that GM's Promotional Practices Have a Disparate Impact on Women

---

[32] Hargrove testified he applied to be a Stationary Engineer because he was new to GM, had never done this type of work because and wanted to try it out; he understood he was starting a "brand new trade." (Hargrove Dep. 24, 33).

Even though GM failed to address Plaintiff's disparate impact claims, waiving their right to dismiss them, GM's practice of relying on a non-diverse panel of interviewers, Farley and Inman, and their subjective interview scoring of the candidates is discriminatory in operation. (MSJ Ex. 1, Grzanka Report p. 5). Indeed, there is no aspect of the interview which consists of a truly objective test, despite GM's characterization to the contrary. The Sixth Circuit adheres to the following analysis:

> Disparate impact analysis requires the Plaintiff to identify—with specificity—the particular procedure having an adverse effect. *Dunlap v. TVA*, 519 F.3d 626, 629 (6th Cir. 2008). A three-part burden-shifting test is then used to examine a disparate impact claim: (1) the plaintiff must establish a *prima facie* case for discrimination; (2) the employer may then show that the challenged procedure is justified by "business necessity"; and (3) the plaintiff can rebut the employer's justification by showing that other tests or selection protocols would serve the employer's interest without creating the undesirable discriminatory effect. *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 425, 95 S. Ct. 2362, 45 L. Ed. 2d 280 (1975).

*Johnson v. Metro Gov't of Nashville & Davidson County*, 502 Fed. Appx. 523, 539 (6th Cir. 2012). To establish a *prima facie* case, the plaintiff must (1) identify a "specific employment practice to be challenged;" and (2) "prove[] that the challenged practice has an adverse impact on a protected group" through the use of "relevant statistical analysis." *Albemarle Paper Co. v. Moody*, 422 U.S. at 425.

The prima facie analysis for element 1 is set forth *supra*. GM claims its interview process was objective, but it was not. *McCabe v. Champion International Corp.*, 1990 U.S. App. LEXIS 18542, at *20 (6th Cir. Oct. 18, 1990) (managers to whom termination decisions were delegated "operated without any objective guidelines" and "discretion to make subjective decisions" was a specific employment practice that could give rise to a disparate impact analysis). To be sure, an objective scoring component has been recognized and encouraged by the Supreme Court and the Sixth Circuit. In *Ricci v. De Stefano*, the Court found that because the "lawful and beneficial"

testing was discarded, in favor of other measures that were less objective, Title VII was violated. 557 U.S. at 581, 584. Likewise, the Sixth Circuit made a similar determination that had there been evidence defendants disregarded valid test scores, a valid disparate impact claim may have been asserted. *Johnson v. Metro Gov't of Nashville & Davidson County*, 502 Fed. Appx. at 542. GM's practice with respect to SE position, which gives weight to subjective perception of experience, and actual experience, that Varner and Elliott were not afforded perpetuates the effects of gender disparity in the workplace. *See also Rowe v. General Motors Corp.,* 457 F.2d 348, 356 (5th Cir.1972) (holding that GM's promotion/transfer standards "freeze" into effect the racial disparity in salaried jobs created by the company's prior policy of explicit discrimination); *Senter v. General Motors Corp.,* 532 F.2d 511, 526, 530 (6th Cir.1976) (affirming the district court's finding that the employer's subjective promotions procedures had the effect of "locking" minorities into the hourly ranks and out of the supervisory ranks)

    Here, GM's divergence from its regular policy of posting for a job, then accepting the applicants (after only women applied), then its divergence from its seniority-based system to a more subjective interview has resulted in discrimination. For example, the key area where there was the greatest divergence of scoring was in Category one, which ultimately resulted in Varner and Elliott's scores falling below the threshold of 119. (Farley Dep. Ex. 14).

| | Weight | Question# | Max poss before weighting | Max Total | CANIDATE NAME Pam Elliott | | CANIDATE NAME Matt Noel | | CANIDATE NAME Michael Hargrove | | CANIDATE NAME Shelly Varner | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Interview score | Weighted | Interview score | Weighted | Interview score | Weighted | Interview score | Weighted |
| Cat. 1 | 3 | 1 | 3 | 9 | 2 | 6 | 3 | 9 | 3 | 9 | 2 | 6 |
| | 3 | 2 | 3 | 9 | 3 | 9 | 4 | 12 | 4 | 12 | 3 | 9 |
| | 3 | 3 | 3 | 9 | 1 | 3 | 3 | 9 | 3 | 9 | 2 | 6 |

Indeed, Farley and Inman awarded Noel and Hargrove more than max total in Question 2, and both scores were changed from a 3 to a 4 on their respective score sheets. (Farley Ex. 11 p. 2920, Ex. 13 p. 2934). Whereas, two of Elliott's scores were lowered. (Farley Ex. 10 p. 2906, 2907).

More subtly, Question 1 focused on whether they had been "lead" or were willing to be lead; unsurprisingly both women were rated lower than the men by the men. (Farley Exs. 14, 10 p. 2905, 11 p. 2919, 12 p. 2947, 13 p. 2933). Likewise, Question 2 focused on "working on heavy equipment" despite years of working on heavy equipment, both women were perceived as weaker than both men and ranked lower. (Farley Exs. 14, 10 p. 2906, 11 p. 2920, 12 p. 2948, 13 p. 2934). Question 3 yielded similarly biased assessments, both women gave information about their experience with pneumatics and hydraulics, yet Elliott's score was originally a 2 and it was reduced to a 1, and Varner was rated a 2, but both men were given 3's. (Farley Exs. 14, 10 p. 2907, 11 p. 2921, 12 p. 2949, 13 p. 2935). Similarly, category 3, which elicited statements about related skill and experience, both Varner and Elliott were rated a 1, and Noel and Hargrove a 4 and 3 respectively, and again Elliott's score was lowered. (Farley Exs. 14, 10 p. 2911, 11 p. 2925, 12 p. 2952, 13 p. 2938).

Accordingly, because GM's promotional policy, which ultimately relies solely on one subjective interview by a non-diverse panel, dispensing with all other more objective elements, it has a disparate impact on women. The statistics lend credence to this conclusion, as does Dr. Grzanka's analysis. According to Dr. Wanamaker, the Spring Hill GM Plant, there is a statistical significance to the rate in which the Spring Hill GM Plant employs a lower share of women in its skilled and semi-skilled trades than other companies within the same industry in not only its local area, but the state of Tennessee, and the East South Central labor markets. (MSJ Ex. 2, Wanamaker Statistical Report p. 1, 6, 7). As a result of the statistical significance, Dr. Wanamaker's conclusion that the low female share of Craft Workers was not the result of ransom elements or chance supports the conclusion GM's practice had a discriminatory impact on Varner and Elliott. (Id. p. 7). Defendant has failed to articulate a business necessity justifying its process. Thus, even though

not raised and it was waived, there is no basis to grant summary judgment on Varner's disparate impact claim.

### 3. GM Retaliated Against Plaintiff

First, GM claims Plaintiff failed to exhaust her administrative remedies. (ECF 52 p. 19). Then, GM claims that Varner cannot meet the third (adverse action) and fourth (causal connection) elements of the easily met prima facie case.[33] (ECF 52 p. 20). Finally, GM argues Varner is unable to demonstrate that its decision was pretext for unlawful retaliation. (ECF 52 p. 25). GM is mistaken.

First, "because aggrieved employees—and not attorneys—usually file charges with the EEOC, their *pro se* complaints are construed liberally, so that courts may also consider claims that are reasonably related to or grow out of the factual allegations in the EEOC charge." *Younis v. Pinnacle Airlines, Inc.*, 610 F.3d 359, 362 (6th Cir. 2010)*.* (citing *Randolph v. Ohio Dep't of Youth Servs.*, 453 F.3d 724, 732 (6th Cir. 2006)). Thus, a plaintiff may also pursue a claim if it is "limited in scope to the EEOC investigation reasonably expected to grow out of the charge of discrimination." *Davis v. Sodexho*, 157 F.3d 460, 463 (6th Cir. 1998) (citing *EEOC v. McCall Printing Corp.*, 633 F.2d 1232, 1235 (6th Cir. 1980)). Moreover, "retaliation naturally grows out of any underlying substantive discrimination charge, making a retaliation claim foreseeable to defendants." *Duggins v. Steak & Shake, Inc*., 195 F.3d 828, 833 (6th Cir. 1999). Ms. Varner was pro se at the EEOC stage, the EEOC assisted her in filing a charge and she alleged a continuing violation. (MSJ Ex. 5, EEOC Activity Log). In response GM's October 7, 2019, Position Statement submitted by its attorney at the time, Jennifer Kellett, Varner provided information that another

---

[33] At the *prima facie* stage, the burden "is not onerous." *George v. Youngstown State Univ.*, 966 F.3d 446, 459 (6th Cir. 2020)

male had been transferred to the CUC even though she had a grievance pending. (MSJ Ex. 6-Varner Letter to EEOC). As such, Varner exhausted her administrative remedies.

*Adverse Action*- The antiretaliation provision, unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment, but from conduct that would have 'dissuaded a reasonable worker from making or supporting a charge of discrimination'.[34] *White v. Burlington Northern & Santa Fe Ry*., 548 U.S. 53, 62-66 (2006). See *Kostic v. UPS*, 532 F. Supp. 3d 513, 542 (M.D. Tenn. 2021)("in the retaliation context, an employer's materially adverse action need not be an employment action"). Thus, despite her pending grievance and at one point being guaranteed consideration and a position once available, nonetheless, GM has continued to bring in men externally and from other plants, who did not have their SE card. (Farley Dep. 39; Risner Dep. Ex. 1 p. 450, 486, 523-25; Inman Dep. 23-28; MSJ Ex. 4 – Defendant Responses to Third Requests for Interrogatories p. 6; Herron Dep. 121, Varner Dep. 119, 140; Hargrove Dep. 32). This element is established.

*Causal Connection*- GM cites an unpublished Sixth Circuit, Kentucky and North Carolina district court opinions to bolster its argument that there was no causal connection. (ECF 52 p. 22). Here, GM not only blatantly rescinded Elliott's plan to place her in the next CUC SE position immediately after Varner and Elliott engaged in protected conduct, but as a result, Varner was likewise left hanging despite the promises of promotion, then even after there was an explicit grievance settlement, GM has refused to consider her and instead has continued its pattern of working around the agreement to hire men. (Elliott Dep. 141, Varner Dep. 130; Herron Dep. 77, 115-17, 134, Ex. 45 p. 000019-20, Ex. 51 p. 4; Risner 30(b)(6) Dep. 87, Ex. 40 p. 2-3).

---

[34] GM cites the wrong standard claiming that a lateral transfer or refusal to make a lateral transfer was not a 'materially adverse employment action' however, post *Burlington Northern*, this is not the standard. *See e.g*., *Szeinbach v. Ohio State Univ*, 493 Fed. Appx. 690 n. 3 (6th Cir. 2012). Moreover, *Freeman v. Potter*, the case cited by GM was a discrimination, not a retaliation case and thus, not persuasive, nor applicable.

*Pretext*- in addition to the evidence of pretext articulated *supra*, in the context of resolving the grievance, Labor raised the issue with Management, McPike whether either Varner or Elliott, could receive the next JIT SE position, since it was a training position, and McPike refused, contending that the CUC "can't handle anymore JIT's" but, then yet another male who did not have a SE card was hired. (Risner Dep. Ex. 42 p. 8827; MSJ Ex. 4, #28). Moreover, it is disputed whether the SE positions that have been filled since were external, internal and whether GM policies for hiring were followed since Varner and Elliott filed their grievances and EEOC charges alleging gender discrimination and retaliation. Additionally, Elliott and Varner ineligible to apply for 4 open CUC SE postings since their complaints because the postings were limited to mechanic Journeyman, not Tool & Die. (Varner Dep. 125; Elliott Dep. 137, 139; Hargrove Dep. 32; Risner 30(b)(6) Dep. Ex. 34, 35; MSJ Ex. 4 – Defendant's Responses to Plaintiff's Third Requests for Interrogatories p. 6). According to Farley, since there has not been an excess of any tradesman in other skilled trades, GM management, including McPike and HR, decided to hire externally so an internal employee would not need to be replaced. (Farley Dep. 36-37; McPike Dep. 10-12). However, Risner testified that no external hires have been hired into SE JIT positions and only bona fide SE Journeymen have been hired externally, but Herron claims this a recent and unusual practice since typically internal candidates should be considered first. (Risner 30(b)(6) 19-20, 53; Herron Dep. 137; Farley Dep. 141, 143; Rutherford Dep. 30; Donaldson 30(b)(6) Dep. 10-11). After Varner and Elliott were non-selected, GM still had an excess of Tool & Die Makers in December 2018, and GM still has an excess. (Varner Dep. 45; Farley Dep. 40; McPike Dep. 13-15, Ex. 21 p. 5611).

Wherefore, for the reasons stated herein, GM's partial motion for summary judgment must be denied in its entirety.

Respectfully submitted,

*/s Heather Moore Collins*
Heather Moore Collins (# 026099)
Ashley Shoemaker Walter (#037651)
HMC Civil Rights Law, PLLC
7000 Executive Center Dr., Suite 320
Brentwood, TN 37027
615-724-1996
615-691-7019 FAX
heather@hmccivilrights.com
ashley@hmccivilrights.com

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of this Opposition to Defendant's Partial

Motion for Summary Judgment has been furnished to via the Court's electronic filing system on

August 10, 2022 to the following:

Luther Wright, Jr.,
Benjamin P. Lemly,
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
SunTrust Plaza, Suite 1200
401 Commerce Street
Nashville, TN 37219-2446
Telephone: 615-687-2213
Facsimile: 615-254-1908
luther.wright@ogletree.com
benjamin.lemly@ogletree.com

*Attorneys for Defendant*

*/s Heather Moore Collins*
Heather Moore Collins