# UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF TENNESSEE
# COLUMBIA DIVISION

| | |
|---|---|
| SHELLY VARNER, | ) |
|     Plaintiff, | ) Case No. 1:20-cv-0079 |
| | ) |
| | ) Judge Campbell |
| v. | ) Magistrate Judge Holmes |
| | ) |
| GENERAL MOTORS LLC, | ) |
| | ) |
|     Defendant. | ) |

## DEFENDANT GENERAL MOTORS LLC'S RESPONSE TO PLAINTIFF'S ADDITIONAL STATEMENT OF MATERIAL FACTS

Defendant General Motors LLC responds to Plaintiff's Additional Statement of Material Facts (D.E. 62, pp. 18-26) as follows:

1. After earning her card, in skilled trades, Varner worked on machinery, lathes, mills, grinders, received blueprints, created parts, worked in the powertrain portion of the plant, the stamping department and as a general assembly mechanic. (Varner Dep. 27). Varner also worked with 100,000lb machines, repaired dies, and made engineering changes, and as a mechanic supported general assembly; she worked at a fast pace, supported other areas, fixed pneumatic guns and hoists, building platforms, and other things to prep for new cars coming in. (Varner Dep. 36-39, 44).

    **RESPONSE:** Undisputed for purposes of Summary Judgment, though Defendant contends this fact is not material to the extent that Plaintiff's work history is not in dispute.

2. Both the local and GM Headquarters investigations are a separate process from the Union investigation and grievance process. (Risner 30(b)(6) Dep. 97). However, this was not done in Varner and Elliott's case. (Risner Dep. 16, 45; Farley Dep. 140; Inman Dep. 88-89).

**RESPONSE:** Defendant disputes the last sentence of this paragraph and notes that the cited deposition testimony does not stand for the proposition asserted, but rather stands for the proposition that an Investigator did not speak with Risner, Inman or Farley. *See* (Risner Dep. 16, 45; Farley Dep. 140; Inman Dep. 88-89). Defendant notes, however, that this fact is not material to Plaintiff's claims or to Defendant's Motion for Summary Judgment as it is not based on whether there was an investigation conducted.

3. When there is a shortage of employees in a particular skilled trade, opportunities will be offered to other trades who want to transfer and be retrained. (Farley Dep. 25). The union shop committee and management, including Jonathan McPike, the Maintenance Manager, agree to the terms of the job posting and whether it will be a "knowledge, skills, and abilities" ("KSA") posting, which is sent to HR to post. (Farley Dep. 25, 27, 34; McPike Dep. 15-16; Inman Dep. 36). According to the local agreement, "where ability, merit, and capacity, as determined by the parties, are equal, the team member with the longest length of service capable of performing the job will be transferred . . . [t]ransfer for KSA areas under Paragraph 63(a) or 63(b) shall be filled by the highest seniority team member who meets the minimum qualifications." (Farley Dep. Ex. 3 p. 354).

**RESPONSE:** Undisputed for purposes of Summary Judgment.

4. GM affirmative action goals might be considered if all applicants are equal. (Risner 30(b)(6) Dep. 28).

**RESPONSE:** Undisputed for purposes of summary judgment. Defendant notes, however that "all applicants" were not equal as noted in Defendant's Statement of Undisputed Facts at ¶¶34-36. *See* [D. E. No. 53]

5. There are no female SEs at GM Spring Hill, and there have not been for approximately ten years; the union has received a number of complaints that the CUC was a "good ole boys club." (Elliott Dep. 123; Inman Dep. 6, 16, 77; Risner 30(b)(6) Dep. 10-11; McPike Dep. 26, Herron Dep. 24).

> **RESPONSE:** Defendant disputes these facts and contends that is not material. While Defendant admits that there are no current female Stationary Engineers at its Spring Hill CUC, there are many female environmental engineers that work at the CUC. (D.E. 63-6, PageID # 735, Inman Dep. at 76:2-12). These engineers work directly with Inman on a daily basis. (D.E. 63-6, PageID # 735, Inman Dep. at 76:2-12). Furthermore, and to the extent Plaintiff's Statement of Additional Material Facts suggests that Defendant actively rejects female stationary engineer applicants, Inman testified that Plaintiff Varner and former Plaintiff Elliott are the only women that have applied to a Stationary Engineer position since 2012, when he became manager. (D.E. 63-6, PageID # 718, 722, Inman Dep. at 6:15-22; 24:18-22).

6. Although, Journeypersons of various skilled trades receive the same hourly rate, the SE is a "large step-up" as employees receive significantly more opportunities for overtime, have a more diverse trade career, and more career options outside of GM. (Varner Dep. 57, 62, 99; Elliott Dep. 62, 64, 66, 108, 168; Farley Dep. 52-53; Noel Dep. 9).

> **RESPONSE:** Disputed and also not material. Disputed to the extent that the cited portions of the Farley Deposition and Noel Deposition do not support the propositions for which they are cited. Farley did not indicate that there was significant overtime, but instead testified that the overtime "comes and goes". (Farley Dep. 52-53). Additionally, Noel testified that the CUC experience was a large step up from his job in the measuring lab, specifically clarifying that testimony. (Noel Dep. 9-10). The citations to the Varner and Elliot Depositions are irrelevant to the extent that they are the perceptions of a former Plaintiff and current Plaintiff and not dispositve.

7. GM initially posted the JIT SE allowing Tool & Die Makers to apply and after [only] females Varner and Elliott applied, McPike removed the original posting and re-posted it for only Mechanics, rendering Varner and Elliott ineligible. (Varner Dep. 92-93, Ex. 6 p. 222-24,

3

Ex. 11 p. 2; Elliott Dep. 137, Ex. 6 p. 235, Ex. 12 p. 324; Inman Dep. 33; Farley Dep. Ex. 9 p. 2883¬84; Herron Dep. Ex. 45, p. 000018, Ex. 46, p. 000020).

> **RESPONSE:** Disputed. Varner testified that all four Tool & Die candidates applied during the initial posting and not just her and the other female applicant. (D.E. 63-1, PageID # 595, Varner Dep. at 93:9-24). As a direct result, any re-posting of the opening would have impacted both male and female applicants equally and is not evidence of any discriminatory practice as Plaintiff suggests.

8. The SE position was eventually re-posted to include Tool & Die Makers again, but it is disputed as to why; Farley testified it was because GM did not receive any mechanic applicants, but Varner and Herron understood that the local union informed management the position could not be limited to mechanics. (Farley Dep. 70; Varner Dep. 92-93; Herron Dep. 20).

> **RESPONSE:** Undisputed for purposes of Summary Judgment, but Defendant notes that this fact, a dispute between Plaintiff and a non-decision-maker and Farley, is not material as it bears no relevance to Plaintiff's claims.

9. In emails Rutherford indicated that the position was only for mechanics, but later testified it was for excess Tool & Die; however, 2 pages of the email thread were not produced. (Rutherford Dep. 7; Farley Dep. Ex. 9, p 2883).

> **RESPONSE:** Disputed and not material. Rutherford testified in his deposition that he was "not sure" or "not positive" about certain details regarding the positions. (Rutherford Dep. pp. 7-8). Plaintiff's assertion about an alleged discovery deficiency is improper in a Statement of Additional Material Facts. Further, Defendant contends that this fact is not material to any of Plaintiff's claims in this matter.

10. When the post was finalized for the CUC SE, none of the applicants were SEs. (Farley Dep. 84; Hargrove Dep. 13; Noel Dep. 25).

> **RESPONSE:** Undisputed for purposes of Summary Judgment and also not material to Plaintiff's claims.

4

11. A JIT position is a position in which an employee is trained to receive their Journeyman card in the skilled trade. Thus, any applicants selected would receive training, including schooling and on the job training. (Varner Dep. 61, Ex. 5 p. 220; Elliott Dep. 67-68, 101; Farley Dep. 15, 85; Rutherford Dep. 14; Herron Dep. 17). A JIT SE must become proficient and get training and education in all three aspects of the SE job: electrical, maintenance/hydraulics, and HVAC. (Inman Dep. 41, 69).

> **RESPONSE:** Undisputed for purposes of Summary Judgment. Defendant notes, however, that this fact is not material to Plaintiff's claims.

12. Inman and Farley conducted y [sic] subjective interviews making determinations whether interviewee responses were "positive" v. "excellent." (Varner Dep. 77, 86; Elliott Dep. 73, 86; Farley Dep. 43, 97; Herron Dep. 14-15).

> **RESPONSE:** Disputed and not material. Herron's deposition testimony does not support this alleged fact as it is general opinion testimony about assessing someone's skills generally. (Herron depo at pp. 13-15). Similarly, Farley's cited deposition testimony does not support the alleged facts as he consistently referenced "guidelines on how to score the questions". (Farley Dep. at p. 97-98). Defendant further asserts that this fact is not material to Plaintiff's claims.

13. Even though there was no objective component, Farley admitted the purpose of multiple interviewers is to ameliorate subjectiveness; the interviewers must justify their scoring because it is submitted to the Chairman and the Maintenance Manager before proceeding with the job offer. (Farley Dep. 19, 33).

> **RESPONSE:** Disputed to the extent that the cited deposition pages do not support this alleged fact. Farley's testimony indicates that multiple interviewers allow room for debate and discussion of application with the listed guidelines. (Farley Dep. 19, 33-34).

14. After the interviews, Farley and Inman discussed their scoring, and came to agreements on some scores for each category, often reducing their scores for Varner and Elliott.

5

(Farley Dep. 77, 79-80, 88-89, 117; Ex. 10 p. 2906-07, 2911, 2917, Ex. 14 p. 3042; Inman Dep. 59, Ex. 17 p. 2992; Elliott 81, Ex. 8 p. 291-92, Ex. 9 p. 2906-07, 2911, 2917). According to Farley, this was because they could not "justify" the scores they gave the women. (Farley Dep. 77). Noel and Hargrove, on the other hand, were given scores that exceeded the max number of points possible, and Farley and Inman increased a score on Hargrove and Noel's score sheets. (Elliott Dep. 103-104, Ex. 10 p. 2882; Farley Dep. 113, 123, Ex. 11 p. 2920, Ex 13 p. 2934; Varner Dep. Ex. 9 p. 2882; Inman Dep. 18 p. 3002, 3008, Ex. 20 p. 3015, 3018, 3022, 3023).

> **RESPONSE:** Disputed. The interview panel did not reduce scores for the female applicants nor did it give scores to the male applicants that exceeded the maximum number of possible points for a particular category. Rather, Inman and Farley met after each interview to discuss the candidate and each interviewer's preliminary scoring to see if there were significant differences in scoring on a particular category. (D.E. 63-6, PageID # 731, Inman Dep. at 59:4-13). Where differences were present, each interviewer would attempt to "justify" the preliminary score given to all candidates, not just the female candidates. (D.E. 63-5, PageID # 698, Farley Dep. at 77:1-8). Furthermore, Plaintiff's allegation that the interview panel increased the scores of the male candidates beyond the maximum possible score appears to stem from a typo on the interview matrix. Specifically, under Category 1 of the Interview Matrix it lists the weight of the second question as "3" with a "max total" of "9." (*See* D.E. 61, Response at p. 24; D.E. 63-15, PageID # 918, Farley Ex. 11, GM000002920; D.E. 63-15, PageID # 932, Farley Ex. 13, GM000002934). However, the interview questionnaire itself clearly states that a "4" may be given for that category where the candidate provides excellent examples *and* possesses experience with the same or similar equipment as used in the CUC. (*See* D.E. 63-15 at p. 4.) In fact, Plaintiff admitted that it was possible to receive a max score of 12 on that category if excellent examples were provided for the same or similar equipment as used in the CUC. (D.E. 63-1, PageID # 596, Varner Dep. at 96:14-97:5). As a result, Plaintiff admits that the male interviewers' scores were not inflated beyond a maximum possible score as alleged here.

15. Inman and Farley chose to weight the "preferred skills" the same as the "required skills." (Varner Dep. 88, 91; Elliott Dep. Ex. 10 p. 2882).

> **RESPONSE:** Disputed to the extent that Plaintiff relies on her own testimony and the testimony of former Plaintiff Elliot about what process the decision-makers utilized. These facts are beyond their personal knowledge. Additionally, Defendant asserts this is not a material fact related to Plaintiff's claims.

6

16. Due to subjective scoring, Varner and Elliott's scores did not meet the 70% threshold, which if they had, seniority would have dictated Varner and Elliott be awarded the positions. (Farley Dep. 93, Risner 30(b)(6) Dep. 23, Ex. 31 p. 8829).

> **RESPONSE:** Disputed to the extent that Plaintiff asserts that the scoring process was unfair or discriminatory. See Defendant's Response to Additional Statement of Undisputed Facts at ¶¶ 13-14. Undisputed to the extent that Plaintiff did not meet the 70% threshold.

17. According to Herron, Varner and Elliott were qualified applicants. (Herron Dep. 19, 44, 112).

> **RESPONSE:** Undisputed for purposes of Summary Judgment to the extent that Herron gave this opinion. Defendant notes, however, that Herron was not a decision-maker, so his perception is not a material fact, nor relevant. (Herron Dep. pp. 148, 192-193).

18. Inman claimed he had concerns with Varner being "turned loose" on industrial equipment based on her experience, however admitted that Varner would have received extensive training and not been "turned loose" as a Stationary Engineer. (Inman Dep. 62-63).

> **RESPONSE:** Undisputed for purposes of Summary Judgement, however Plaintiff does not provide the proper context of the comment. Inman's deposition testimony was that "it would be unfair to turn somebody loose on something like that when all they've done is some residential, you know water heater type work." (Inman Dep. 62). Inman further testified that Plaintiff admitted she needed a lot of training in electrical, didn't go near that." (Inman Dep. 62-63). Defendant notes, however, that this fact is not material to Plaintiff's allegations.

19. Farley told Elliott that Management did not want to train her and Varner, because it would take a year and half and they would need an electrical class; however, Noel and Hargrove received the same training regardless of their background and Journeyperson retraining was anticipated to take a year and a half;[7] which contradicts Farley's assertion that the JIT Stationary Engineer education and training is individualized based on the employee's prior experience and

7

contradicts to Inman's testimony that due to Noel's previous experience he would only have to take electrical coursework; contradicting his own testimony. (Farley Dep. 15, 57, 84-85; Noel Dep. 25; Hargrove Dep. 22, 17; Herron Dep. 17, 29, 36; Inman Dep. 41, 69; Varner. Dep. 62; Elliott Dep. Ex. 12 p. 324; McPike Dep. Ex. 21 p. 5613-16).

> **RESPONSE:** Defendant asserts that Plaintiff has not asserted a fact for Defendant to respond to as this purported additional fact is purely argumentative. To the extent that a response is required, Defendant does not dispute the alleged deposition testimony cited for purposes of Summary Judgment, but notes that it is not material as the testimony is related to a Plaintiff who has been dismissed from this case.

20. When Elliott spoke to McPike about her non-selection, he responded, "we have a great bunch of guys over there and they get along so well;" a conversation McPike disputes. (Elliott Dep. Ex. 3 p. 5, Ex. 19 p. 9; McPike Dep. 28).

> **RESPONSE:** Disputed and not material. Plaintiff Elliott is no longer a Plaintiff in this matter. Additionally, McPike denied making such a statement as noted in this Paragraph. Finally, this fact is not material to Plaintiff's claims as McPike was not a decision-maker and even if made, his comment would be a stray remark.

21. According to Dr. Wanamaker, the Spring Hill GM Plant, there is a statistical significance to the rate in which the Spring Hill GM Plant employs a lower share of women in its skilled and semi-skilled trades than other companies within the same industry in not only its local area, but the state of Tennessee, and the East South Central labor markets. (MSJ Ex. 2, Wanamaker Statistical Report p. 1, 6, 7). Notably, this statistical significance is not present in its unskilled workforce. (Id. p. 1, 7). As a result of the statistical significance, Dr. Wanamaker concluded the low female share of Craft Workers was not the result of ransom elements or chance. (Id. p. 7).

> **RESPONSE:** Undisputed for purposes of Summary Judgment, but immaterial to the extent that the sample size used to reach these conclusions is not large enough to be probative. Defendant further notes that there were only two female applicants during the relevant time period. *See Response to ¶ 5 above.*

22. Because Herron believed there had been a clear violation of the union agreement, he did not refer Elliott and Varner's grievances to the civil rights committee for investigation concluding it would have been a waste of time due to the evidence of discrimination. (Elliott Dep. 136; Herron Dep. 224-25).

**RESPONSE:** Undisputed for purposes of Summary Judgment, but not material to the extent that Herron's beliefs are not relevant to Plaintiff's claims.

23. On May 21, 2019, after Randall Brasich, HR/LR Relations, received all of Varner and Elliott's grievances, Herron and Brasich negotiated a settlement for Varner and Elliott regarding their grievances of discrimination, and Brasich notified McPike. (Varner Dep. 108, Ex. 12 p. 2975; Brasich Dep. 12-14, Ex. 22-27; Elliott Dep. Ex. 13 p. 2881). This settlement included that Elliott, due to her seniority, would be placed in the next open SE position, regardless of whether it was formally a JIT, and Varner would receive the next open position after Elliott, and would be trained. (Varner Dep. 112, 119, 121-22; Herron Dep. 60; Elliott Dep. 100, 127, Ex. 21 p. 3). However, Risner and McPike disputed this, testifying that this settlement was only an agreement that Varner and Elliott would be "considered" for the next JIT SE in the powerhouse, and McPike could not recall being notified. (Risner 30(b)(6) Dep. 86; McPike Dep. 32; Brasich Dep. 15). Herron testified that the ambiguous "consideration" language was to allow for the extreme situation in which there was a plant shut down, which would give that SE priority for placement into the open position. (Herron Dep. 61, 67, Ex. 52 p. 00004; Ex. 53 p. 00003).

**RESPONSE:** Disputed to the extent Plaintiff suggests that there was any official written agreement that Plaintiff Elliott would be placed in the next available stationary engineer opening. Herron further admitted that the grievance settlements, which use the explicit language that Varner and Elliott would only be "considered" for the next available openings, was language that both GM and the Union fully agreed on during negotiations. (D.E. 63-13, PageID # 862-863, Herron Dep. at 232:14-18, 233:25-234:15).

9

24. Elliott and Varner should have been notified of any open positions after the settlement. (Rutherford Dep. 28).

**RESPONSE:** Disputed. Herron himself described at least one situation where any grievance settlement would have been trumped by the National Agreement and Plaintiff would not have been notified of any such opening. (D.E. 63-13, PageID # 864-865, Herron Dep. at 240:10-241:8).

25. According to Herron and union documents, there was a date selected for Elliott to be placed in a CUC position, and discussion of backdating their seniority dates. (Risner 30(b)(6) Dep. 87, Ex. 40 p. 2-3; Herron Dep. 237; Elliott Dep. Ex. 15 p. 326).

**RESPONSE:** Defendant notes that the Union is not a party to this action and this allegation is therefore not material to this dispute. Defendant notes however, that this fact is not material as Elliot has been dismissed from this matter.

26. GM did not investigate Elliott or Varner's grievance complaints or EEOC charges; Risner did not have any communications with Elliott or Varner regarding their complaints, Brasich could not recall talking to Headquarters about an investigation into the complaints, and neither Farley or Inman were interviewed or spoken to regarding any GM investigation into Elliott and Varner's grievances, and no formal investigation was conducted, as there was an "external investigation underway." (Risner Dep. 16, 26, 45; Farley Dep. 140; Inman Dep. 88-89; Tocco Dep. 13).

**RESPONSE:** Disputed to the extent that Plaintiff contends that there was no investigation into Plaintiff's allegations. The cited deposition testimony references an "informal process" and the fact that there was an "external investigation" underway.

27. After Elliott and Varner filed their EEOC charges, GM changed rescinded an offer to place Elliott in a CUC SE JIT position. (Elliott Dep. 141, Herron Dep. 115-17, Ex. 45 p. 000019-20, Ex. 51 p. 4).

10

**RESPONSE:** Disputed. This amounts to nothing more than a conclusory assertion and there has been no evidence offered by Plaintiff that supports this contention. Risner testified in his capacity as a 30(b)(6) representative that GM has a zero tolerance policy for retaliation and does not retaliate against any employee who makes a complaint against the company. (D.E. 63-3, PageID # 668, Risner Dep. 41:11-42:12).

28. GM continues its pattern of retaliation and by failing to fulfill the grievance settlement and it continues to refuse to place Varner into the position of SE even though positions have been opened since Noel and Hargrove. (Varner Dep. 130; Herron Dep. 77, 115-17, 134; Risner 30(b)(6) Dep. 87, Ex. 40 p. 2-3; Elliott Dep. Ex. 15 p. 326).

**RESPONSE:** Disputed. See response to ¶ 27 above.

29. Four men have been hired into the CUC as SE; Elliott and Varner have been ineligible to apply because these postings have been exclusively for Mechanic Journeyman, not Tool & Die. (Varner Dep. 125; Elliott Dep. 137, 139; Hargrove Dep. 32; Risner 30(b)(6) Dep. Ex. 34, 35; MSJ Ex. 4 – Defendant's Responses to Plaintiff's Third Requests for Interrogatories p. 6).

**RESPONSE:** Disputed and not material. Disputed to the extent that two of the referenced individuals transferred to the positions pursuant to the National Agreement and were already Journeyperson SEs. (MSJ Ex. 4 – Defendant's Responses to Plaintiff's Third Requests for Interrogatories p. 6-7). Defendant asserts that this fact is not material as Plaintiff Varner was ineligible for these later openings per the agreement between Defendant and Plaintiff's Union.

30. According to Farley, since there has not been an excess of any tradesman in other skilled trades, GM management, including McPike and HR, decided to hire externally so an internal employee would not need to be replaced. (Farley Dep. 36-37; McPike Dep. 10-12).

**RESPONSE:** Undisputed for purposes of Summary Judgment. Defendant notes that this fact is not material to Plaintiff's claims.

11

31. Risner testified that no external hires have been hired into SE JIT positions and only bona fide SE Journeymen have been hired externally. (Risner 30(b)(6) 19-20, 53).

**RESPONSE:** Undisputed for purposes of Summary Judgment, but Risner further testified that he would "have to check" on the two individuals referenced during the deposition and there was confusion noted with the terms "internal to the corporation," "off the street" and "external" during the deposition and whether someone was hired through the NEPC. (Risner 30(b)(6) 19-20, 53-54). Defendant further asserts that this fact is not material to the extent that Plaintiff was determined to not be eligible for the referenced positions.

32. According to Herron, it is new and unusual that SEs are being posted only to external candidates, that internal candidates should be exhausted before posting externally. (Herron Dep. 137; Farley Dep. 141, 143; Rutherford Dep. 30; Donaldson 30(b)(6) Dep. 10-11).

**RESPONSE:** Disputed. Herron admitted that he had no involvement in the application or selection process and he did not have any idea of the qualifications of candidates considered for skilled trades positions. (D.E. 63-13, PageID # 850, Herron Dep. at 181:21-183:14). Moreover, Herron retired in 2020 and has no knowledge of GM or Union items since that time. (D.E. 63-13, PageID # 830, Herron Dep. at 102:8-9).

33. After Varner and Elliott were non-selected, GM still had an excess of Tool & Die Makers in December 2018, and GM still has an excess and a need for more SEs. (Varner Dep. 45; Farley Dep. 40; McPike Dep. 13-15, Ex. 21 p. 5611).

**RESPONSE:** Disputed. Neither Farley, Varner, nor McPike testified that there was an excess of Tool & Die Makers in December 2018 as alleged. Further, both Inman and Farley testified that there was not an excess of any skilled trade from 2021 to present. (D.E. 63-6, PageID # 723, Inman Dep. at 26:1-20; D.E. 63-1, PageID # 581, 608, Farley Dep. at 37:11-18, 142:12-143:2).

34. There have been no plant company-wide shutdowns since 2018 and Inman testified that of the four male employees selected for the CUC SE positions since Varner and Elliott's non-selection, in 2021, at least two of them were external hires, one from the Navy and another from a

winery, neither had SE or journeyperson cards. (Inman Dep. 25-28; MSJ Ex. 4 – Defendant Responses to Third Requests for Interrogatories p. 6; Herron Dep. 121; Risner Ex. 35).

> **RESPONSE:** Disputed to the extent it is unclear what Plaintiff means by "no plant company-wide shutdowns since 2018." Plaintiff is aware that GM did experience temporary layoffs as a result of the COVID-19 pandemic both plant and company-wide.

35. GM continues to retaliate against Varner because SE CUC positions continue to be filled with men. (Varner Dep. 119, 140; Hargrove Dep. 32; Inman Dep. 23-25).

> **RESPONSE:** Disputed. This alleged fact is a conclusory assertion masquerading as a material fact. Additionally, see response to Statement of Additional Facts at ¶¶ 31-33 above.

36. At the time of deposition, neither Noel nor Hargrove had received their SE Journeymen cards. (Hargrove Dep. 16; Noel Dep. 26). Both acknowledged their training was extensive. (Noel Dep. 19-21; Hargrove Dep. 17-20). Noel in particular recognized that that "he could go on for hours and hours" on what he has had to learn, because "there's so much to learn." (Noel Dep. 19).

> **RESPONSE:** Undisputed for purposes of Summary Judgment, but also immaterial. What training or certifications the selected candidates have earned since being hired into their roles is not relevant to Plaintiff's underlying claims.

Respectfully submitted,

*/s/ Luther Wright, Jr.*
Luther Wright, Jr., TN BPR #017626
Benjamin P. Lemly, TN BPR #035225
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
SunTrust Plaza, Suite 1200
401 Commerce Street
Nashville, TN 37219-2446
Telephone: 615-687-2213
Facsimile: 615-254-1908
luther.wright@ogletree.com
benjamin.lemly@ogletree.com

*Attorneys for Defendant*

# CERTIFICATE OF SERVICE

I hereby certify that on August 24, 2022, the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon the following:

Heather Moore Collins
Ashley Shoemaker Walter
HMC Civil Rights Law, PLLC
7000 Executive Center Drive, Suite 320
Brentwood, TN 37027
heather@hmccivilrights.com
ashley@hmcivilrights.com

*Attorneys for Plaintiff*

*/s/ Luther Wright, Jr.*